## CHARLESTON.

### SIMS v. CARPENTER, FRAZIER & CO.

Submitted October 26, 1909.   Decided November 22, 1910.

1. PARTIES—*Parties Plaintiff—Action on Contract.*

Except in a few instances of statutory creation, by way of exception, an action at law upon a contract must be prosecuted in the name of the party having the legal title or right involved. A person who has acquired an interest in a working contract, subsequent to the making thereof, is not a necessary party plaintiff in an action thereon.

2. NEW TRIAL—*Verdict—Sufficiency of Evidence.*

If, upon the trial of an issue of fact, as to which there is conflicting oral testimony, undisputed and uncontroverted conduct on the part of one of the parties, and clearly established facts and circumstances, wholly inconsistent with his contentions and claims, founded upon the oral testimony in his favor, are disclosed by the evidence, the verdict should be rendered in accordance with the theory, sustained by such conduct, facts and circumstances; and, if the jury disregard them and

render a verdict contrary thereto, the trial court should set it aside, notwithstanding the conflict in the oral testimony.

3. CONTRACTS—*Evidence.*

In an action upon a working contract between a railroad contractor and a sub-contractor for excavation and grading, the oral evidence. is conflicting as to whether or not the sub-contractor agreed to be bound by the estimates to be furnished by the engineers of the railway company; the sub-contractor adduces no testimony as to how the extent of his work and compensation should be determined, and neither makes nor causes any surveys or estimates to be made; for a period of several months, he acquiesces in statements rendered to him by the contractor from the monthly estimates furnished by the railway company's engineers, and received his compensation accordingly. *Held:* That this conduct is controlling and precludes the jury from finding that he is not bound by. the estimates of the engineers.

4. APPEAL AND ERROR—*Review—Verdict.*

If, upon an issue of fact, the oral testimony is conflicting and free from the presence of controlling facts and circumstances, established or undisputed, a verdict founded thereon cannot be disturbed, since it turns alone upon the credibility of witnesses, lying, wholly within the province of the jury.

5. TRIAL—*Instructions.*

An instruction, authorizing a finding upon the theory of a right, founded upon a custom or usage of which the court cannot take judicial notice, is properly refused, in the absence of evidence, tending to prove its existence and adoption as a part of the contract, on which the action was brought.

6. SAME—*Conduct of Trial—Improper Argument.*

In an action by· a sub-contractor for work on railroad construction, against the principal contractor, a statement in argument to the effect that the railway company is behind the defense, is improper and should be excluded by the trial court, in the absence of any provision in the contract between the railway company .and the contractor, making the former liable · for a recovery from the latter by a sub-contractor.

Error to Circuit Court, Cabell County.

Action by J. R. Sims against Carpenter, Frazier & Co. Judgment for plaintiff, and defendant brings error.

*Reversed and Remanded.*

*George S. Wallace,* for plaintiffs in error.

*Marcum & Marcum,* for defendant in error.

Poffenbarger, Judge:

In the circuit court of Cabell county, J. R. Sims recovered a judgment, against Carpenter, Frazier & Co., for $2,600.00, in an action of *assumpsit,* brought to recover money alleged to be due from the defendants, principal contractors with the Chesapeake & Ohio Railway Company, to the plaintiff, a sub-contractor. Assigning a number of errors, the defendants obtained a writ of error.

The evidence having disclosed that R. P. Sims, a brother of the plaintiff, had become interested in the contract after it was made, the defendants moved to dismiss the action on the ground of a variance or non-joinder of necessary parties. The theory of the motion is not clearly stated, but it is immaterial. The subject matter of the contract was grading on certain sections of new roadbed, constructed by the C. & O. Railway Co., in making certain alterations in its line between St. Albans and Barboursville. This work consisted of both excavation and filling. The contract was taken in the name of J. R. Sims. After it had been obtained and the use of a steam shovel became necessary, R. P. Sims aided his brother in the purchase of one with the understanding that he should have a share of the profits to arise from certain portions of the work. We think the motion to dismiss was properly overruled. In actions at law, founded upon contracts, the only necessary parties plaintiff are those who have the legal title or right involved. *Clarkson* v. *Doddridge,* 14 Grat. 42, 44; *Crawford* v. *McDaniel,* 1 Rob. 448; 4 Min. Ins. Part I, p. 450; 15 Enc. Pl. and Pr. 484. There are some statutory exceptions to this rule, but this case does not fall within any of them. The interest of R. P. Sims arose out of a contract between him and J. R. Sims, not between him and the defendants. Direct interest in the subject matter always gives standing in equity, but the rule in actions at law is narrower. There, the interest must be legal and direct, not merely equitable or indirect, unless some statute confers the remedy at law.

The principal matters in controversy consist of two items, one of which amounts to $515.97. Had Sims completed the work he agreed to do, there would be no controversy about this.

Original liability for it on the part of the defendants is not denied. It is a part of a percentage of money, due Sims for work actually done, which the defendants retained as a means of compelling him to complete his contract. It was held under a provision usually inserted in building contracts for the purpose. In June, 1907, the railway company, under its contract with the defendants, rightfully suspended the work covered by its contract with them. They notified Sims of the suspension and he stopped work and removed his tools, machinery and appliances to a place in the State of Illinois where he obtained work from other parties, leaving the work he had contracted to do for the defendants incomplete. On the resumption of construction work on the C. & O. Railway, in June, 1908, the defendants, after having demanded of Sims completion of the unfinished work, did it themselves, at a cost, they say, largely in excess of the amount of money retained, after having allowed him his contract price per cubic yard. Sims claims the defendant released him from further performance of the contract, on the suspension, ordered in June, 1907, in view of the fact that the work remaining to be done was not of sufficient magnitude to justify his coming back with his machinery, appliances and men. On the contrary, J. C. Carpenter, the head of the defendant firm, says Sims was not released. Admitting certain conversations with him, relating to the unfinished work, he says the understanding was that his firm would complete it for Sims and on his account, in case he should prefer not to come back. On this point, Carpenter says "I told Mr. Sims a few days before he left—he remarked about 'the work not being enough to come back there and finish it', and I told him, that if it did not suit him to come back there and finish the work, that I would finish it for him." He says Sims assented to this proposition. Sims' statement is as follows: "The conversation was along the C. & O. main line track, and Mr. Carpenter asked me 'what kind of a piece of work I had', and I told him, He asked me 'what the price was', and I told him, and he told 'probably it would be all right, I was moving a lot of loose and solid rock.' I told him, 'yes, but it was the best I could do', and he said, 'well, I hope you will have good luck; you won't have enough here to come back for; when we get ready to start up, we will finish what you have got here; there won't

be enough to come back for.'" He had previously said he regarded his contract completed when the defendants ordered him to stop work. The contract, under which the defendants were working, 'reserved to the railway company the right to suspend the work at any time. Both admit that the subcontract was verbal, but their testimony is in direct conflict as to whether the terms of the principal contract should apply between the principal contractor and the sub-contractor. For the defendant in error, it is insisted that this state of the evidence gives rise to a question, lying wholly within the province of the jury to decide. For the plaintiff in error, it is insisted that the facts, circumstances and conduct, bearing on the question, are such that a verdict contrary thereto cannot be permitted to stand. This is the legal question involved and it extends to the next item in controversy, namely, compensation for something over 8,000 cubic yards which the plaintiff claims to have taken out of a certain cut made to change the course of Mud River, in addition to the yardage allowed him by the defendants and to the defendants by the railway company.

The estimated amount of earth to be taken out of the cut known as the "river change" was 35,000 or 36,000 cubic yards. The final estimate, made by the railway company's engineer after the completion of that work, and based upon actual measurements, shows 30,575 cubic yards. The plaintiff claims he removed 39,152 cubic yards. This claim is based upon a survey and estimate, made more than two years after the completion of the work and after the river had been turned through the cut, by an engineer employed by him. The theory of the defendants is that, assuming the measurements and calculations made by this engineer to have shown the quantity claimed, a large portion of the excavation had been made by the river after the cessation of work by Sims. It is also denied that the measurements and calculations are founded upon correct data. Shipe, the engineer, testified that the depth of that cut on the north side, as he took it for the purposes of his calculation, ranged from 16 to 21 feet. The defendant claims the depth of the cut on that side, as originally made, ran from 12 feet at one point to nothing or practically nothing. It seems not to be controverted that this cut was made in a hillside along the line of the new roadbed of the railroad, sloping from the south

towards the railroad, and that, at one end, a small ridge or point, having a slighter declivity than the balance of the hillside, ran to the railroad, at which point the cut on the north side was about 12 feet. This is the contour of the ground as shown by the railway company's engineer and the testimony of J. C. Carpenter. Some of the men who worked for Sims testified on the subject and they either substantially admitted the facts, as stated by the railway engineer and Carpenter, or their lack of knowledge of the condition of the ground in its natural state. The earth, taken from the cut, was carried out on the north side thereof to make an embankment to control the course of the river and probably also to make a fill for the railroad roadbed. Two circumstances are relied upon, therefore, to sustain the estimate of the railway engineer and condemn that of the plaintiff's engineer, Shipe: one, that a great deal of earth not removed by Sims was washed away by the river during the two years intervening between the completion of the work and the date of the survey made by Shipe; and the other, that the Shipe survey and estimate are based upon false data in respect to the depth of the cut on the north side. There is contradictory evidence concerning the width of the cut actually made. According to the original specifications, the slope would have been one to one-half, making the bottom of the cut 70 feet wide. The railway company engineers say that, when about ten per cent. of the work had been done, Sims was verbally ordered to make the slope one to one and did so, thereby reducing the width of the bottom to 60 feet. Sims denies this verbal order, but does not say specifically that he made the bottom of the cut 70 feet wide. He says he did the work in accordance with the specifications, denies the verbal order and relies upon the approximate estimate, made before any work was done, and claims to have been informed that it was about 41,000 cubic yards. It is admitted by the railway company engineer that the stakes were not changed, but they say the change in slope and consequent width of the bottom of the cut did not necessitate any change of the stakes, and that the stakes on the surface would have remained the same whatever the slope might be.

From what has been said, it is obvious that the power of the court to disturb the verdict depends upon the conclusions respecting two questions: First, whether Sims agreed to be bound

by the terms and conditions of the contract between the railway company and the defendants, so far as they were applicable and not modified or excluded by the terms of the verbal subcontract; and second, whether the correctness of the railway engineer's final estimate is so far sustained by established or indisputable facts as to place it beyond the power of the jury to disturb it.   On both of these questions, the conduct of the parties has important bearing.   The oral testimony as to what the contract was is in direct conflict as to everything except the work contracted in the first instance to be done and the prices to be paid therefor.   Sims and Carpenter disagree absolutely as to the time and mode of payment, the estimates upon which payments should be made and the right of the defendants to suspend the work.

Carpenter says he told Sims, at the time of the making of the contract, that he did not have a copy of the specifications and that Sims said it made no difference, since he was familiar with all railroad specifications and they were about the same. He says he told him he was to do the work under the instructions of the railroad engineers and their plans; and that he would be paid as the railway company paid the defendants, and explained that the estimates did not come punctually or regularly.   He further says "I agreed to pay him just what the C. & O. engineers allowed us for it, and he was to take their measurements finally;" and also "I was to furnish statements each month.  *  *  *  *  I agreed to Mr. Sims to furnish it to him and I did furnish it to him."   Carpenter further says "All the contract I made with him, he was to do the work according to the plans and specifications of the Chesapeake & Ohio Railway Company's engineer", and further that "the contract was that he was to do the work for so much money and to do it according to the instructions and the plans and specifications given him by the engineer."   Sims says he worked by the stakes set by the engineers and by their direction; that he was to be paid ninety per cent. on or about the 20th or 25th of the month for the work done the previous month; that the railway company's engineers figured it and turned it into the general contractor and the general contractor gave it to the sub-contractor, in accordance with the custom on railroad work everywhere; that he did not agree to take his compensation, when the rail-

way engineers should furnish the estimates, nor when the defendants were paid by the railway company.

The work was commenced in May, 1906. Estimates were made monthly by the railway engineers from that time until it ceased, June 30, 1907. By these estimates, both Sims and the defendants were governed in their accounts relating to the amount of work done. The whole amount of work done and materials furnished by Sims amounted, according to the engineer's estimate, to $50,319.39. The work on the river change was practically all done as early as October 30, when about 30,000 yards was included in the estimate on account of that work. That number of yards appeared in the estimate for November and December. In January, it was increased to 30,575. Sims, in the meantime, was working on other contracts he had with the defendants and the whole amount estimated to have been done by him up until the last of January, 1907, was $28,780.25, February $33,910.25, March $40,120.25, April $44,-022.25, May $48,100.25. A statement, rendered to Sims by the defendant on the 16th day of August, 1907, shows all of the work estimated prior to May 1st except $609.46 had been paid. Then the May and June estimates were added. It thus appears that nearly $44,000.00 of the entire $50,000.00 had been paid, from time to time, upon the estimates made and furnished by the railway company's engineers. These estimates were rendered to the defendants and they rendered statements to Sims, based upon them. Neither the defendants nor Sims ever had any estimate made on their own account for any purpose, during the progress of the work, so far as the record discloses. Sims says he agreed to do the work under the directions of the company's engineers and did do so. While not admitting that he agreed to be bound by the estimates of the engineers, and denying that he was to receive his compensation only as the estimates were made, it seems that he did nevertheless accept the estimates, settle in accordance with them and receive his pay as they were furnished. It is altogether improbable that he received compensation before statements were rendered him, and the defendants rendered no statements until after the estimates had been received. More than half of the work had been done before any objection was made by him to any of the estimates. The first documentary evidence of

dissatisfaction with the estimate is found in a letter from Carpenter to Sims, dated February 9, 1907, purporting to be a reply to a letter from Sims, complaining of failure to allow the yardage he was entitled to on account of the river change. The next is a letter from Sims to Carpenter dated June 8th, saying "I notice by estimate sheet sent us that we were not allowed balance due us on account of changing channel of Mud River. Will you please look after this so we can get it next pay day." On June 10, Carpenter & Co. replied to this, saying "Beg to advise that you were allowed everything that was allowed us by the railway company. We will take the matter up with them and endeavor to have the shortage allowed." None of these letters specify the amount of the shortages or the extent of Sims' claim, and nothing more seems to have been done or said about it until June 22, 1908, when Sims, by letter, refused to return and complete the unfinished work and asserted a demand of $3,372.22. He instituted this suit November 20, 1908. After making the objection to the estimate in February, 1907, he continued the work he was engaged in for the defendants, increasing his estimates on other portions of it, until the whole amounted to something over $50,000.00, and there is no further evidence of any complaint or objection to the estimates, except his letter of June 8, 1907, which failed to specify the amount he claimed. This record fails to show how much work he did on the river change or claims to have done in the month of January, 1907, otherwise than by the railway company's estimate of 575 yards. The estimate for July, 1906, showed 18,900 yards, for August 24,400, for September 24,400, for October 30,300, for November 30,000, and for December 30,000. He seems, therefore, either not to have done any work on the river change from October until January or to have made no complaint of the disallowance for work he had done, and he does not show what work he did or how many days he worked there in January. While the estimate shows an increase of 575 yards in January, Sims says the river change work was completed in December, and he made no complaint until February. The bulk of this work seems to have been done in the month of October and prior thereto. From October 30th until December 31st, nothing seems to have been done on it. Statements were rendered showing nothing and no complaint was

made. In January some additional work, the amount of which is not shown otherwise than by the estimate, seems to have been done and then complaint of a shortage was made, but the extent thereof was not then shown or indicated.

We think the facts and circumstances disclosed leave no room for doubt that Sims agreed to be bound by the estimates of the railway engineers. He recognized and settled by them so far as any settlements were made, from May, 1906, until February, 1907. At least he acquiesced in them. He made no estimates himself, although within that period he had done over $25,000.00 worth of work. Upon whose estimate was he relying, if not those of the railway engineers? Carpenter says he agreed to be bound by them. He denies this, but his actions speak louder than his words. He accepted them and called for nothing else, never questioned them for a period of seven months, and made no measurements nor estimates himself nor caused any to be made. Denying he was to be bound by the railway estimates, he fails to say what agreement he did make, concerning this vital matter. Is it probable that this was left unprovided for? Here is conceded conduct on his part, the tendency of which is to contradict his own statement as to the terms of the verbal contract and corroborate and confirm the statements of Carpenter. This is a circumstance of great weight which the jury could not exclude simply because of contradiction in oral testimony as to the terms of the contract. It is an undisputed fact bearing directly upon the question. To this we must add another consideration. The subject matter of the contract and the relation of all the parties to it were well known to both. Sims knew the defendants were contractors and could not reasonably or justly afford to pay for more yardage than they received pay for from the railway company. He knew the objects and purposes of the contract on the part of the defendants as well as he knew its objects and purposes on his own part. It is altogether improbable and absurd that either of these parties intended or thought he was making a contract, binding the contractor to pay the sub-contractor for more yardage than would be allowed by the builder to the contractor. Upon this question the following observations of Judge BRANNON, in *Johnson* v. *Burns*, 39 W. Va. 658, 671, are forcibly applicable: "Now, add to this the facts that the timber was

thirty-inch poplar, used only for lumber, and was purchased to be made into lumber, and not for spars and other round timber uses, as plaintiff knew; that the price paid was fair and reasonable for timber measured under Scribner's square measure rule and could not be paid for timber measured solid; and that round timber was only used for spars and pilings, not lumber—facts undisputed, which in themselves alone inspire an inherent improbability, that there was a special contract to pay on the basis of solid measure. Then reflect that the jury overruled the evidence of three witnesses, two of them disinterested, and the weight of the facts above stated carrying an intrinsic weight of probability, and if this Court performs any function on the evidence, we must say, the verdict is against the decided weight and preponderance of the evidence. Were the matter to be solved on the evidence of the witnesses alone, though the preponderance seems to be with the defence, yet the state of the case would be different; but those undisputed facts come in with telling weight to corroborate the version given by the defendants' witnesses." In discussing *Johnson* v. *Burns* and distinguishing it and cases of its class from those in which only the credibility of witnesses is involved, we said, in *Fulton* v. *Crosby-Beckley Co.*, 57 W. Va. 91, 97, "in the former, the evidence showed certain physical facts and well known customs and usages, which the parties clearly understood, in view of which the contract was made, and which were actually and necessarily comprehended in the manifest objects and purposes of the parties to the contract, so that failure of the jury to recognize them and harmonize the other evidence with them, had resulted in a verdict, palpably wrong and against the overwhelming weight of the evidence, viewed as a whole. The other case is of much the same character, admitted circumstances, and incontrovertible physical facts governing and controlling the weight and force of all the other evidence and facts, and irresistibly leading to a conclusion different from that embodied in the verdict, having been ignored by the jury." Another illustration of the rule is found in *Chapman* v. *Liverpool Salt Co.*, 57 W. Va. 395. These cases are not in conflict with *Coalmer* v. *Barrett,* 61 W. Va. 237. The principle thereof is recognized in that case, point 4 of the syllabus, in the following terms: "To justify setting aside a verdict in a case involving

conflicting oral evidence, on the ground alone that the verdict is plainly against the decided weight and preponderance of conflicting evidence, the court must go beyond the question of the credibility of the witnesses who gave conflicting oral evidence in the presence of the jury, and find documentary evidence, uncontroverted evidence, facts and circumstances, or some of these, which when considered with such conflicting oral evidence plainly constitute a decided weight and preponderance of evidence against the verdict." For the proposition that conduct has controlling influence in this class of transactions, when the contract is silent, respecting some matter inherently involved, as it is here, according to the testimony of Sims. *Boody* v. *R. & B. R. Co.*, 3 Blatchf. (U. S.) 25, is authority. There the time of payment was not specified. Upon proof of conduct and custom, the court held the parties had intended monthly payments upon monthly estimates.

This conclusion brings the case within a well settled rule as to the item claimed on account of the river change. In *Baltimore & Ohio R. R. Co.* v. *Polly, Woods & Co.*, 14 Grat. 447, it was held that a provision in a working contract between a railroad company and a construction company, making the final estimate of the railroad company's engineer conclusive upon the parties as to the amount and character of the work done, was valid, binding and controlling, unless vitiated by fraud or gross misconduct. The same principle was asserted by this Court in *McConnel* v. *Hughes,* 50 W. Va. 41. See also *Baltimore & Ohio R. R. Co.* v. *McCulloch,* 12 Grat. 595, and *Mills* v. *Norfolk & Western Ry. Co.,* 90 Va. 523. Here a final estimate was made at the end of the month of June, 1907, and communicated to the defendants by the railway company and by them to Sims, and there is no evidence of fraud or misconduct on the part of the engineer.

This conclusion would set aside the verdict, but there is another aspect of the case in which the controlling force and effect of established facts would accomplish the same purpose. Sims did not cause any survey and estimate to be made until after the river had run through this excavation for about two years, producing an altered condition. It does not appear that Shipe had ever seen the ground in its natural condition. He admits that his estimate is based upon a depth of the cut on

the north side, ranging from 16 to 20 feet deep. All of the evidence of those who were in a position to know what its depth was on that side shows that, at the deepest place, it was only 12 feet and that for a considerable distance it was only one foot and in some places nothing at all. This is the testi- mony of Davis, the engineer, and also of Carpenter. Sims does not pretend to say what it was. Some of the men who worked for him testify to a high embankment on that side, after the work had been commenced and prosecuted for some time and the earth taken from the excavation deposited there. One of these, Reese, when asked whether there was practically no bank at all on the north side, when the work was commenced, said they had commenced work before he went there and he did not know. When asked what he had said about the measure- ment or distance from the bottom of the cut to the top of the bank, he said he had said it was 15 or 18 feet up to where they had filled it. Another of these witnesses, Chapman, after having stated that the bank was higher than his head, admitted that it was not that way all along and, finally, that he did not know how much the lowest point was above grade. Davis, the railway company's engineer, says he went upon the ground and actually measured the cut after it was made and finished and computed the quantity of earth actually taken out of it. Shipe says he found grade stakes but does not say how many he found nor where they were. He does not say he found the grade stakes on the north side. It is hardly probable that he did, since that side was filled and the scrapers had been dragged over the places at which the stakes had stood. Under the prin- ciples above stated, the finding in favor of the plaintiff as to this item, would have to be set aside by reason of the controlling force of the facts shown. Nobody disputes directly the estimate made by Davis. Nobody sustains the data upon which Shipe made his estimates. He is unable to testify as to the correctness of it himself. Nobody denies that the river had swept large quantities of earth out of there during the two years which in- tervened between the completion of the work and the date of Shipe's survey. Nobody but Davis made a survey and estimate under the conditions existing at the date of the completion of the work. Sim's denial of the verbal order to increase the slope and so narrow the bottom to 60 feet introduces a question

of veracity or memory between him and Davis, but he does not say he made the cut 70 feet wide. He asks the jury to find it from statements of his implying it. He admits Davis told him in December, before he did the January work in that cut, that the slope had been changed, and yet he made no objection to the December estimate and caused no measurement to be made. On this point the evidence of Sims lacks clearness and definiteness, and is shaken by his conduct and overthrown by the weight of established facts.

As to the item of $515.97, called "retained percentage", the finding must depend upon whether or not the defendants released Sims from further performance of his contract. They do not say he agreed to be bound by the provision of the contract between them and the railway company, authorizing the latter to suspend work. This contingency seems not to have been discussed by the parties nor provided for in their agreement. The evidence fails to show any provision on the subject. The defendants gave Sims notice of the order to suspend and he did so. He claims they ordered him to stop and thereby justified his abandonment of the incomplete work, and also that they consented to such abandonment and released him from any further obligation. They deny this and say they agreed to complete the work for him and on his account, in case he should prefer not to return and finish it. We think this makes a case for jury determination and the finding in respect to it cannot be disturbed. It depends wholly upon the credibility of the witnesses.

There was another item of about $500.00 for ties, poles and timbers, left on the ground by Sims, on leaving, and a portion of a trestle, erected for the purposes of a fill, all afterwards used by the defendants. As to the quantities of timber, its value and whether it was used by the defendants, there was a good deal of conflicting evidence. The jury allowed the plaintiff $200.00 on account of this item, but he released that portion of the verdict. We find no fault with the instructions and rulings, applicable to it. As to whether the finding was sustained by the evidence, we are not called upon to say, since it was released.

Defendants' peremptory instruction to find for them was properly refused, as were also their instructions to disregard

the items for retained percentage and timber.  This necessarily results from the conclusions already stated.  Defendants' instructions Nos. 4 and 6, asserting a supposed custom or usage by which sub-contractors on railroad work are bound by the estimates of the railway engineers, was properly·refused, there being no evidence of the existence of such usage or custom. *Anderson* v. *Lewis,* 64 W. Va. 297.

Plaintiff's instruction No. 1, embodying, in apt terms, his theory of release from liability in respect to the unfinished work; his instruction No. 2, relating to his claim for timber, used by the defendant, and framed in language, unobjectionable, so far as we can see; and his instruction No. 3, respecting yardage in the river change cut, were all properly given.  That the verdict, founded on the last one, cannot stand, is immaterial. There was evidence tending to support the demand and that suffices.  *State* v. *Clifford,* 59 W. Va. 1 (syl. pt. 14).

Defendant's special interrogatory No. 1, pertaining to the amount of the retained percentage, was properly refused, there being no controversy as to the amount.  Their interrogatory No. 2, asking the jury to define the interest of R. P. Sims, was properly refused, since he was no party to the contract involved, nor to the action.  Their interrogatories Nos. 5 and 6, relating to the same matter, were properly refused.  Their interrogatories Nos. 7 and 8, calling for findings as to whether Sims had completed his work when he left, were properly refused, incompleteness of the work having been admitted, and the controversy being whether the defendants had released him.  These interrogatories would have been misleading and the answers thereto immaterial.

The interrogatories propounded at the instance of the plaintiff, requiring findings as to whether the defendants used the plaintiff's timber and the value thereof and whether he quit work by their direction, were obviously proper, in view of principles and conclusions already stated.

The exclusion of two jurors, as being disqualified by reason of employment by the C. & O. Railway Company, was not ground for reversal, if erroneous.  *Thompson* v. *Douglas,* 35 W. Va. 337. We perceive no reason for an inquiry as to the correctness of the ruling, since it may not be repeated on a new trial.

The charge, made in argument, and unsupported by evidence,

that the railway company was behind the defense, importing aid rendered by it to the defendants and interest in the result on its part, was improper, and should not have been permitted. An effort to sustain the propriety thereof proceeds upon the theory of liability of the railway company to the defendants, consequent upon recovery by the plaintiff. This is a *non sequitur*. The contract makes no such provision and the second action would be between different parties, in which the judgment in this action would be neither *res judicata,* nor admissible as evidence. *Cornell* v. *Hartley,* 41 W. Va. 493; *Buford* v. *Adair,* 43 W. Va. 211; *Long* v. *Willis,* 50 W. Va. 341; *State* v. *Irwin,* 51 W. Va. 192. Whether refusal on the part of the court to exclude the statement, complained of, would call for reversal, we need not say, since the judgment must be reversed on other grounds.

For the reasons stated, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and Remanded.*

WILLIAMS, JUDGE, *(dissenting):*

I agree to the law announced in the syllabus, but I cannot consent that points 2 and 3 are properly applicable to the facts in this case. The evidence is extremely conflicting on every material fact in the case, so much so that I am unable to see how the court can say that the verdict is against the evidence, or that it is plainly wrong. In fact, I think, the verdict is right. The principal matter of contention was concerning the amount of yardage in the work known as the "river change." Davis, the railroad engineer, testified that he measured this excavation shortly after the work was completed, and found it to contain 30,575 cubic yards. But his testimony was based on recollection of what he had done two years before, and he doesn't remember what width was given, in his calculations, to the bottom of the cut, whether seventy feet or less. He also says that he made an estimate of the quantity to be excavated before any work was done on it, and that it was 35,000 or 36.000 yards. The yardage could be as accurately ascertained before, as after the work was completed, provided the work was done according to the original specifications. Sims testifies that he did this work according to the original specifications; and that

the original estimate, given him by Davis, before any work was done was 41,000 yards. Davis says there was a modification in the plan of the cut which reduced the yardage, and that Sims was notified by him of this change. Sims denies this, and the jury were the judges of their credibility. Shipe, an experienced engineer, measured the excavation at the instance of plaintiff two or three days before the trial, and testified that it contained 39,152 cubic yards. He says Mr. Sims showed him the engineer's stakes which were still standing indicating the grade line, or surface, as it was originally. Shipe also exhibited a diagram showing the various lines and angles by which he had made his measurements. This diagram was made part of the evidence which the jury considered, and it does not appear in the record now before us. It, therefore, appears that all the evidence upon which the jury acted is not before this Court. How then is it possible for us to say that the verdict is wrong? Engineer Shipe was asked by counsel for plaintiff where the surface was originally, and he answered this question by pointing out the lines upon the diagram; and the reading of his answer as it appears in the record, showing frequent references to lines and figures on the diagram, indicates very clearly to my mind that the jury were given a much clearer idea of whether, or not, this witness' measurements were correctly made upon the ground than we can possibly obtain from reading his evidence without the aid of the map. Shipe says expressly that the width of the bottom of the cut, as allowed by him in his calculations, was seventy feet, and that the slope was one to one, and that this slope was illustrated by a dotted line on the map. On the other hand, witness Davis exhibited no map, or figures, and testified from memory as to what he did two years before. He does not know what width he allowed for the bottom, but *thinks* it was seventy feet, and does not know whether he allowed seventy feet all the way through, or not. The fact that the river had been flowing through the cut for two years, and possibly had changed the width of the bottom, does not affect the case; the original surface lines were still there, marked by stakes, and these lines furnished the bases of measurement, regardless of any intervening change in the width of the bottom. The jury were the judges as to which one of the two engineers' measurements and calculations was more

nearly correct; and, in view of the absence from the record of the diagram used by Shipe to illustrate his work, I do not think this Court can say that his work is wrong. It is true that Shipe's measurements and calculations show a greater yardage than Davis says he told Sims was his original estimate, made before any excavating was done, which he says was 35,000 or 36,000 yards, but Shipe's calculations show a less quantity than Sims says Davis told him was his original estimate, which was 41,000 yards.

The contract between the parties was oral, and there is great conflict in the testimony as to its provisions. Defendants claim that plaintiff agreed to be bound by the measurements made by the railroad company's engineer; this is denied by Sims. I do not think the fact that Sims received partial payments, as the work progressed, according to measurements furnished monthly, is entitled to any weight whatever in determining the question of the actual amount of the excavation made. He had the unquestionable right to payment for the yardage which he removed under the contract. Mr. Sims says these monthly estimates were furnished to him by Mr. Carpenter's bookkeeper, and that he does not know whether they were made by the railroad company's engineer or not, but he thinks they were made by defendant's bookkeeper. Even if Sims had agreed that the measurements of the railroad company's engineer should be final and binding, still this would not preclude him from showing that there was either fraud or gross error in his measurements or calculations; a shortage of nearly 9,000 cubic yards, nearly twenty-three per centum, is sufficient to show that there was gross error.

If there ever was a case wherein the verdict of a jury is entitled to stand, for the reason that it rests upon conflicting testimony of witnesses, I think this is such a case. I am clearly of the opinion that the judgment of the lower court should have been affirmed. I am opposed to overturning verdicts which are supported by evidence concerning the weight and value of which, under the established rules of law, juries are made the sole judges. I not only can not see that the verdict is plainly wrong, but I can go even further and say from the record, that, if I had been a juror trying the case, I would, very probably, have found the same verdict.