WANDA LEE MULDOON

v.

WADE H. KEPNER, DOING BUSINESS AS KEPNER FUNERAL HOME

(No. 10754)

Submitted January 17, 1956.    Decided March 13, 1956.

*Carl G. Bachmann, Gilbert S. Bachmann,* for plaintiff in error.

*Goodwin, Spillers & Mead, Russell B. Goodwin, C. Lee Spillers,* for defendant in error.

RILEY, JUDGE:

In this action of trespass on the case, instituted by the plaintiff, Wanda Lee Muldoon, in the Circuit Court of Ohio County, against Wade H. Kepner, doing business as Kepner Funeral Home, to recover damages for personal injuries allegedly resulting to the plaintiff while riding as a guest-passenger in the defendant's ambulance, which resulted from a collision between the ambulance and an automobile owned and being driven by Louis Laudermilt in the opposite direction from which the ambulance was travelling, the plaintiff prosecutes this writ of error to a judgment of the circuit court in defendant's favor, based upon a jury verdict.

The collision between the two vehicles occurred on March 7, 1953, on United States Route No. 40, within the corporate limits of the City of Wheeling, a short distance west of a bridge, commonly known as the "S" bridge. At the time of the collision, approximately eleven o'clock on Saturday night, March 7, 1953, there was a heavy snow storm, which resulted in covering with snow Route No. 40, along which defendant's ambulance was proceeding in a westerly direction to the North Wheeling Hospital, located in the City of Wheeling proper. The falling and fallen snow rendered driving

conditions difficult, in particular at the place of the collision the marked lanes on Route No. 40 for traffic going east and west having been obliterated by the fallen snow.

As the judgment of the circuit court in favor of defendant was based upon a verdict of the jury, it is the duty of this Court to determine whether the verdict of the jury is without sufficient evidence to support it, or is plainly against the clear preponderance of the evidence. If it is, the judgment of the circuit court should be reversed, the verdict set aside and a new trial awarded. Pt. 4, syl., *Rees Electric Co.* v. *Mullens Smokeless Coal Co.*, 141 W. Va. 244, 89 S. E. 2d 619; pt. 11, syl. *Toppins* v. *Oshel*, 141 W. Va. 152, 89 S. E. 2d 359; *Ward* v. *Smith*, 140 W. Va. 791, 86 S. E. 2d 539; *Kap-Tex* v. *Romans*, 136 W. Va. 489, 67 S. E. 2d 847; *Cannady* v. *Chestonia*, 106 W. Va. 254, 145 S. E. 390; *Palmer* v. *Magers*, 85 W. Va. 415, 102 S. E. 100; *Griffith* v. *American Coal Company*, 78 W. Va. 34, 88 S. E. 595; *Kelley* v. *Aetna Insurance Company*, 75 W. Va. 637, 84 S. E. 502; *Sims* v. *Carpenter, Frazier and Company*, 68 W. Va. 223, 69 S. E. 794; *Coalmer* v. *Barrett*, 61 W. Va. 237, 56 S. E. 385; *Chapman* v. *Liverpool Salt and Coal Company*, 57 W. Va. 395, 50 S. E. 601.

In this regard it is the duty of this Court to consider all of the credible evidence introduced on behalf of the plaintiff and the defendant, and determine whether, as a matter of law, the trial court should have directed a verdict in favor of the plaintiff and proceeded with the trial on an inquiry for damages.

Initially, the question arises whether the defendant's ambulance, in which plaintiff was riding as a guest-passenger, was an "emergency vehicle", so that it could be operated by defendant's driver in a manner different from other motor vehicles.

Over the objection and exception of the plaintiff and plaintiff's motion to exclude, certain provisions of an

ordinance of the City of Wheeling, contained in the Code of the City of Wheeling, relating to the designation of certain vehicles as "emergency vehicles", and providing for the operation thereof as such, were read to the jury.

The Code of the City of Wheeling, Chapter 20, Section 68, entitled: "Operation of Vehicles or Approach of Authorized Emergency Vehicles", provides: "Upon the approach of any authorized emergency vehicle giving automobile signal by bell, siren or exhaust whistle, the operator of every other vehicle shall immediately allow the right of way to said vehicle and drive his vehicle to a position as near as possible and parallel to the right hand edge or curb *or* the street (other than on one way street) clear of any intersection and shall stop and remain in such position until the authorized emergency vehicle shall have passed, unless otherwise directed by a police officer."

The Code of the City of Wheeling, Chapter 20, Section 1 (b), entitled: "Authorized Emergency Vehicles", provides: "Vehicles of the Fire Department, Police Department, and such ambulances and other vehicles of municipal departments or public service corporations and individuals operating privately owned ambulances, as are designated or authorized by the City Manager."

Section 8 of Chapter 20 of the Code of the City of Wheeling, entitled: "Exemptions as to Authorizing Emergency Vehicles", provides: "The provisions of this chapter regulating the movement, parking and standing of vehicles shall not apply to authorized emergency vehicles as defined in this chapter while the driver of such vehicle is operating same in an emergency. This exemption shall not, however, protect the driver of any such vehicle from the consequences of a reckless disregard of the safety of others."

After both plaintiff and defendant had rested their cases without counsel for defendant producing and offering in evidence a permit signed by the City Manager of the City of Wheeling, designating or authorizing de-

fendant's ambulance as an authorized emergency vehicle under the ordinance, as provided by Chapter 20, Section 1 (b) of the Code of the City of Wheeling, and immediately before counsel for the plaintiff and defendant had made their closing arguments, the trial court, theretofore having given a general charge to the jury in lieu of instructions, orally instructed the jury to disregard the testimony of August L. Dailer, Clerk of the City of Wheeling, in regard to the provision of the ordinance "which requires other cars to stop or drive to the curb when an emergency vehicle approaches. * * * because the permit from the City Manager was not shown." To this counsel for the defendant saved an exception.

Over plaintiff's objection, the court admitted a paper on a form provided by the Commissioner of Motor Vehicles of West Virginia, which embraced the application of defendant for designation of his ambulance as an emergency vehicle, under Chapter 17-C, Article 1, Section 6, of Chapter 129, Acts of the Legislature, Regular Session, 1951, approved by the Chief of Police of the City of Wheeling, and to be operated as provided in Section 5, Article 2, of said Chapter 17-C. Section 6, Article 1, of Chapter 17-C, provides: "Vehicles of the fire department, police vehicles, and such ambulances and emergency vehicles of municipal departments or public service corporations as are designated or authorized by the commissioner or the chief of police of an incorporated city, and such privately owned ambulances and emergency vehicles as are designated by the commissioner." Section 5, Article 2, of Chapter 17-C, provides, in part:

"(a) The driver of an authorized emergency vehicle, when responding to an emergency call or when in pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions herein stated.

"(b) The driver of an authorized emergency vehicle may:

"(1) Park or stand, irrespective of the provisions of this chapter;

"(2) Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

"(3) Exceed the speed limits so long as he does not endanger life or property;

"(4) Disregard regulations governing direction of movement of turning in specified directions.

\* \* \*

"(d) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."

As the defendant did not produce and offer in evidence a permit signed by the City Manager of the City of Wheeling, as provided by the Code of the City of Wheeling, Chapter 20, Section 1 (b), designating defendant's ambulance as an authorized emergency vehicle, the ordinance was properly excluded by the trial court from the consideration of the jury, the provisions of Section 68 of the ordinance, requiring other vehicles to yield the right of way to an ambulance upon its approach, "giving automobile signal by bell, siren, or exhaust whistle", do not enter into the decision of this case.

Inasmuch as this case was tried on the theory that defendant's driver, though he was driving the ambulance at a moderate rate of speed, was, nevertheless, negligent in driving the ambulance on the wrong side of Route No. 40, past an automobile travelling in the same direction, subsection (b), Section 5, Article 2, Chapter 17-C of Chapter 129, Acts of the Legislature, Regular Session, 1951, providing that vehicles authorized by the Commissioner of Motor Vehicles under Section 6, Article 1

of Chapter 17-C, may exercise the privileges enumerated in subsection (b), is not applicable as a defense to this action. Moreover, subsection (d) of Section 5, Article 2, Chapter 17-C, provides expressly that the driver of an authorized emergency vehicle shall not be relieved from the duty to drive with due regard for the safety of all persons, nor shall the provisions protect the driver from the consequences of his reckless disregard for the safety of others, and, as the record discloses that the ambulance was not being driven in an actual emergency, the ambulance must be considered as though it were an ordinary motor vehicle as it proceeded from the "S" bridge along Route No. 40 toward North Wheeling Hospital. It follows that defendant's ambulance driver, as he was driving the ambulance in a westerly direction along Route No. 40, was charged with the duty to use reasonable care to avoid colliding with other vehicles, which care is such as a reasonably prudent man would use in the same or similar circumstances, as shown by the record, and the trial court so properly instructed the jury in the general charge.

As the plaintiff, Wanda Lee Muldoon, was a guest-passenger in defendant's ambulance, her right to recover rests upon the sole theory that defendant, under the doctrine of *respondeat superior*, was guilty of negligence, which was the proximate cause of plaintiff's injuries. If the negligence of the driver of the oncoming Laudermilt automobile was the sole cause of plaintiff's injuries, plaintiff, of course, would have no cause of action against defendant. If, however, defendant's driver and the driver of the Laudermilt automobile were both guilty of negligence, which negligence proximately contributed to the plaintiff's injuries, plaintiff would be entitled to recover against the defendant, though Laudermilt was not joined in this action as a party defendant. In this jurisdiction the liability of tort feasors is both joint and several. *Day* v. *Louisville Coal & Coke Co.*, 60 W. Va. 27, 53 S. E. 776, 10 L. R. A. (N.S.) 167; *Hains* v. *Parkersburg, M. & I. Ry. Co.*, 71 W. Va. 453,

76 S. E. 843; *State ex rel. Bumgarner* v. *Sims,* 139 W. Va. 92, 79 S. E. 2d 277. And, where a person is injured as the result of the concurrent wrongdoing of several joint tort feasors, the injured person may proceed against any or all of the joint tort feasors in an action at law to recover damages for his alleged injuries. *Massey* v. *Payne,* 109 W. Va. 529, 155 S. E. 658. The question here, therefore, in view of the fact that Laudermilt has not been made a joint defendant in this action and the verdict of the jury was in favor of the sole defendant, Wade H. Kepner, is whether the trial court should have held, as a matter of law, that defendant's driver was guilty of actionable negligence, which proximately caused plaintiff's injuries, and directed a verdict in favor of plaintiff and against the defendant and then had the action proceed on an inquiry of damages.

Early in the evening of March 7, 1953, plaintiff received a telephone call from her father, Luther B. Vermillion, who told her that he had fallen and injured himself. Mr. Vermillion lived on Roney's Point Run, a branch road leading into United States Route No. 40, which was some distance east of McGraws Run Road, likewise leading into Route No. 40, on which plaintiff lived. Upon receiving the call from her father, plaintiff and her husband drove to the Vermillion home, and, having ascertained that Mr. Vermillion had been severely injured in the fall, plaintiff's husband called by telephone the defendant's place of business, requesting that an ambulance be dispatched to take Mr. Vermillion to North Wheeling Hospital, located in the City of Wheeling proper, a number of miles west of the Vermillion and Muldoon homes.

Defendant's ambulance arrived at the Vermillion home with the driver, Edward L. Hurley, who had been employed by defendant in the driving of ambulances for approximately fourteen years, and an attendant, Alvin W. Johnston. Defendant's employees, upon arrival at the Vermillion home, carried Mr. Vermillion out on an ambulance cot and placed him in the rear portion of the

ambulance, which was separated from the front portion of the ambulance where the driver and attendant were seated. This rear portion of the ambulance, in which the injured man was placed by defendant's employees, was separated from the front portion of the ambulance by a wooden partition, which had a sliding glass panel, which was kept closed while the ambulance was in operation, through which the attendant could look into the rear of the ambulance to observe the condition of the person to be hospitalized.

Plaintiff, having so requested, was given permission to accompany her father to the hospital in the ambulance. At the time of the collision plaintiff was occupying one of two seats in the rear of the ambulance along the side of the cot next to her father, and directly behind the wooden partition at a place approximately between the driver and the attendant.

From the branch road upon which the Vermillion home was located the ambulance entered Route No. 40, and proceeded in a westerly direction toward the City of Wheeling. Shortly after the ambulance crossed the bridge, designated in the record and commonly known as the "S" bridge, which is at the easterly corporate limits of the City of Wheeling, the ambulance proceeded along Route No. 40 generally in a westerly direction toward the City of Wheeling proper, where the hospital is located. Shortly after crossing the "S" bridge, the ambulance encountered, according to defendant's witnesses, three or four automobiles likewise proceeding along Route No. 40 in a westerly direction, and in an endeavor to pass the lead car, which was operated by plaintiff's witness, Clarence Wiley, who was en route to his place of employment at the Continental Foundry in the City of Wheeling, the collision occurred between the ambulance and a 1939 Chevrolet automobile, occupied by Louis Laudermilt, the owner and operator of the car, who was not available as a witness, and his cousin, Orland Laudermilt, as a guest-passenger, the latter of whom was

sitting beside the driver in the front seat of the Chevrolet automobile, and who testified on behalf of the plaintiff.

As heretofore stated, on the night of March 7, 1953, a heavy snow had fallen and was falling, rendering driving conditions difficult. The fallen snow had obliterated the lines marking the lanes of travel on the highway from the "S" bridge to and beyond the point of collision, and the falling snow served to obscure the visions of those travelling along Route No. 40.

From the easterly end of the "S" bridge, Route No. 40 was thirty feet wide, which width of thirty feet extended westerly for a considerable distance beyond the point where the collision occurred. For some distance east of the point of collision there were sign posts erected by The State Road Commission of West Virginia, designating passing and no passing zones. After the ambulance had crossed the "S" bridge, it entered into a passing zone. The first sign encountered by the ambulance was a "No Passing Zone Ahead" sign, located two hundred feet west of the westerly end of the "S" bridge. Two hundred seventy-three feet to the west of this sign was a sign marked "No Passing Zone", which last-mentioned sign was located just west of the travelled portion of the highway, and opposite the eastern end of a concrete retaining wall, extending along the sidewalk opposite the "No Passing" sign. This retaining wall was one hundred and eighteen feet, eight inches long, in the center of which, or fifty-nine feet and four inches west of the easterly end of the concrete wall, were concrete steps. At or near the westerly end of the retaining wall was a public utility pole.

"Plaintiff Exhibit 2", prepared by Kenneth Dailey, Safety Engineer of the City of Wheeling, and the testimony of Mr. Dailey, establish beyond peradventure that the "No Passing Ahead" sign was designated at the extreme eastern end on the plat prepared by him; that this sign is about two hundred feet west of the easterly end of the "S" bridge; that Exhibit 2 designates Route

No. 40 from Webster Avenue, intersecting Route No. 40 at a point some distance west of the point of collision between the two vehicles, to the point where the "No Passing Ahead" sign is located; that from the westerly end of the "S" bridge to the "No Passing Ahead" sign there is a distance of about two hundred feet; that from the "No Passing Ahead" sign to the "No Passing" sign directly opposite the easterly end of the concrete retaining wall there is a distance of two hundred seventy-three feet, measured in a straight line, though the plat discloses that the distance between the two signs, the "No Passing Ahead" sign and the "No Passing" sign, is somewhat more than two hundred seventy-three feet because of a slight turn in Route No. 40 to the left, facing in a westerly direction, just before the road straightens out as it reaches the "No Passing" sign.

Likewise it is established by this record beyond cavil that from about the easterly end of the "S" bridge to the "No Passing Ahead" sign and westerly to the first "No Passing" sign, located across Route No. 40 directly opposite the eastern end of the concrete wall, Route No. 40 consisted of a three-lane highway, each lane being approximately ten feet wide, marked with distinct lines, which, as heretofore stated, were obliterated by the fallen snow. The two right lanes, looking in a westerly direction, were for travel in a westerly direction, the direction in which defendant's ambulance was travelling as it proceeded toward the hospital; but at the first "No Passing" sign these lines converged into two parallel lines, running close together, which constituted the center line of the highway, and provided for fifteen feet of pavement on each side thereof. This center line extended for some distance past the point of collision beyond Webster Avenue, a street intersecting with Route No. 40, being the westerly point from which the safety director extended his plat, as shown on Exhibit 2, in an easterly direction to the "No Passing Ahead" sign.

The plaintiff produced three apparently disinterested witnesses to the collision: Clarence Wiley, the driver of

the automobile which defendant's ambulance was passing at the time of the collision, and Franklin Charlton McIntyre and Martha Wagner, age sixteen and fourteen years, respectively, who were walking on the sidewalk along the concrete retaining wall in an easterly direction toward the "S" bridge at the time of the collision.

Wiley testified that he first became aware of the ambulance when it was about forty feet behind his automobile, as he was driving in the same direction defendant's ambulance was approaching from the rear; that he noticed the red light of the ambulance in the side mirror of his automobile, and then heard the blast of the siren, as the ambulance started to pass him; and that on hearing the siren he pulled his automobile over as close as he could to the right curb of the highway. This witness estimated the speed of the ambulance as it attempted to pass his car as between thirty-five and forty miles an hour, and the speed of his car as between twenty and twenty-five miles an hour; and that as the ambulance proceeded to pass the Wiley automobile, it "pulled out wide around me and got clear over in this other guy's lane and hit this car." Wiley's testimony is also to the effect that at the time of the collision, defendant's ambulance had not yet completely passed his car, and witness estimated the place of the collision to be about the western end of the concrete retaining wall near a public utility pole, which is designated on plaintiff's Exhibit 2 by a black dot, and from the plat itself it appears in this record that the utility pole was at the westerly end of the concrete retaining wall, or slightly more than one hundred eighteen feet west of the first "No Passing" sign and well within the "No Passing" zone.

Plaintiff's witnesses, McIntyre and Martha Wagner, testified they were walking in an easterly direction toward the "S" bridge along the sidewalk at or near the western end of the concrete retaining wall at the time the collision occurred; that the collision occurred near the western end of the concrete retaining wall, so close to the place where the young couple was walking that

the McIntyre boy attempted to shield his companion with his body to protect her from possible injury from the impact of the collision.

McIntyre testified that when he and his companion were near the western end of the concrete retaining wall, he saw the ambulance pull out to pass another car, evidently the Wiley car; that he observed the red blinker light on the ambulance working, but did not hear the siren, and, on looking around, he saw another car coming from the opposite direction, and this automobile and the ambulance collided. Though the witness did not see the ambulance pull out to pass the Wiley automobile, he saw it as it was passing, or attempting to pass. At that time the ambulance was about eighteen feet from where the witness and his companion were standing, but when the collision occurred the ambulance "was right in the other lane, right in the lane going out towards S bridge", which is the lane next to the sidewalk upon which the young couple was walking. Though the witness could not tell whether the colliding vehicles were together after the collision or some distance apart, he testified the cars were two or three feet from the curb. Both of the vehicles, according to this witness, were being operated before the collision at what he terms "normal speed". On cross-examination McIntyre stated that he noticed the red blinker light on the ambulance "right after it came off the S Bridge", and at that time it had started to pass the Wiley automobile; and that the Laudermilt automobile was in its own lane "in the path you made kind of in the snow." Prior to that the witness stated on direct examination that when he noticed the ambulance passing the Wiley automobile, it was near the Fort Henry Motel, which the record discloses is almost opposite the western end of the concrete retaining wall.

Plaintiff's witness, Martha Wagner, testified that she did not see the red blinker light on the ambulance; that she heard the sound of the ambulance's siren and saw the ambulance attempting to pass the Wiley car; and that when the ambulance and the car, approaching from the

opposite direction, collided they were "about a couple of feet away from the curb, and we were next to that wall"; and that when the ambulance collided with the car going in the opposite direction, the ambulance was "on the side we were on in the wrong side of the road", entirely over the center line. Martha Wagner testified on cross-examination that after the ambulance had crossed the "S" bridge, it started to pass the Wiley car "where that big concrete wall begins, but I am not sure." And, finally, this witness stated that the ambulance was past the center line of the road, because "It was close to the curb a couple feet away from the curb, and I know that is past the center."

Both McIntyre and Martha Wagner left for home immediately after the crash, walking toward the "S" bridge, and did not notice any happenings thereafter.

Plaintiff's witness, Orland Laudermilt, who was seated in the front seat of the Louis Laudermilt automobile next to the driver, Louis Laudermilt, testified that at the time of the collision the Laudermilt automobile was being driven about twenty to twenty-five miles an hour; and that the first thing he observed as the Laudermilt car was approaching the place of the collision were "two red lights blinking is all I saw and then this head-on collision hit." These red lights, the witness testified, were right ahead of the Laudermilt car on "The right side of the road." The witness stated he did not see the ambulance after the collision, bcause his eyes were full of glass; and that at the time of the collision the Laudermilt automobile was being driven close to the curb. Witness gave no answer to the inquiry whether when he first saw the lights of the ambulance it was on "Your side of the road?" By this witness counsel for plaintiff introduced into evidence a photograph of the automobile, which shows as far as that vehicle is concerned, that the collision was practically head on.

Two members of the Police Department of the City of Wheeling, who arrived at the scene of the accident shortly after it occurred to make an investigation, testified

on behalf of the plaintiff substantially to this effect:

City Police Officer Val Thomas testified that both vehicles were "a couple feet" from the curb on Laudermilt's side of the road, which, of course, would be the wrong side of the road for defendant's ambulance to travel; and City Police Officer Leon McGinnis testified that tire marks of the ambulance, as he observed them in the snow where they crossed the center line of the road, came over to the side of the road next to the pavement on Laudermilt's side of the road.

The foregoing disposes of all of the evidence contained in this record adduced on behalf of plaintiff which bears, in a general way, on the manner in which the collision occurred, and, if that were the only evidence contained in this record, the trial court without question should have directed a verdict in favor of the plaintiff. And, unless the testimony of defendant's ambulance driver, Edward L. Hurley, and the ambulance attendant, Alvin W. Johnston, the only two non-medical witnesses who testified on behalf of the defendant concerning the collision, served to create a conflict in the evidence on the question whether the defendant's ambulance driver was guilty of negligence in the operation of defendant's ambulance, which was the sole proximate cause of plaintiff's alleged injuries; or, as heretofore indicated, the testimony of these two witnesses for the defendant created a conflict in the evidence on the question whether both the driver of the Laudermilt car and the defendant's ambulance driver were guilty of concurrent negligence, which proximately caused plaintiff's alleged injuries, this Court would not be justified in setting aside the verdict of the jury in favor of the defendant.

Defendant's witness Hurley on direct examination testified that he was in the act of passing "three or four cars", which were going in the same direction as the ambulance; that he first saw the Laudermilt automobile approaching "one hundred or one hundred and fifty feet" away, "* * * going sideways and head out towards me"

and "Out towards the center of the pike as though it had skidded"; that at the time of the collision there were "Approximately ten feet" of the highway to the left of the ambulance; that the "two front ends" of the vehicles came in contact, but he was unable to state where, if at all, the vehicles moved after they had collided; and that he did not pass any automobile in a "No Passing" zone. However, this witness on cross-examination stated that he had passed "about three" automobiles after he crossed the "S" bridge; that he was passing the lead automobile, evidently the Wiley car, at the point in the highway where the "No Passing" zone starts, his testimony being "And the accident happened just about where the no passing starts"; and that he had started to pass the Wiley automobile about the upper end of the concrete wall, which is the end toward the "S" bridge, which plaintiff's Exhibit 2 discloses to be across Route No. 40 from the first "No Passing" sign.

The ambulance attendant, Alvin W. Johnston, testified on direct examination on behalf of the defendant that he was seated in the front of the ambulance next to the driver Hurley, facing partly toward the rear checking the condition of the patient a few minutes before the collision, but turned facing the front when Hurley shouted, "Here comes a vehicle at us head on"; that when he turned around he "saw the glare of the headlights coming directly at us"; that the collision occurred almost instantly thereafter; that after the ambulance passed the west end of the "S" bridge, the siren of the ambulance was sounded to give warning to two or three cars travelling in a westerly direction; that "The center line of the three lane highway was clear at the time"; that as the ambulance was passing the last or lead automobile "We were in a passing zone"; that when the ambulance started to pass the cars ahead, he did not observe any automobile coming from the opposite direction; and that when he first observed the headlights of the vehicle coming from the opposite direction, evidently the Laudermilt automobile, "it was possibly maybe around

two hundred feet ahead, or one hundred feet". This witness, however, on cross-examination testified that at the time of the collision the ambulance was abreast of the lead car; that the collision occurred in front of the concrete steps in the center of the concrete retaining wall; and then in answer to the question, "Are those steps in the no passing zone, can you recall", this witness answered, "To my recollection the no passing zone begins from there on west". However, as the concrete steps in the retaining wall are slightly more than fifty-nine feet within the "No Passing" zone, this witness's testimony, like that of Hurley, leaves no doubt that the ambulance at the time of the collision was being driven so that when it was passing the lead or Wiley automobile, it was well within the "No Passing" zone, as indicated by the sign opposite the easterly end of the concrete wall.

On the basis of the postulate set forth earlier in this opinion, that the ordinance of the City of Wheeling has no application, and Chapter 17-C, Article 2, Section 8, of Chapter 129, Acts of the Legislature, Regular Session, 1951, does not relieve the defendant's ambulance driver from the duty to use reasonable care and does not permit the passing by that ambulance of a car or cars within a "No Passing" zone, we are of opinion that the defendant was guilty of actionable negligence, which, as a matter of law, proximately caused plaintiff's alleged injuries.

We are further of the opinion that even if the Laudermilt automobile had skidded to its left, colliding with defendants ambulance, the collision would not have occurred if the ambulance had been operated to the right of the center line in its own line of traffic.

In the circumstances portrayed by this record we are of opinion that the trial court should have directed a verdict in favor of the plaintiff, and proceeded to try the case before the jury on an inquiry of damages. In the latter regard we note that the printed record contains no substantial evidence of plaintiff's injuries, but the ori-

ginal record filed in the office of the Clerk of this Court, shows that there was substantial medical evidence in favor of both plaintiff and defendant, bearing on the nature and extent of plaintiff's injuries. By stipulation the parties evidently provided that the testimony of the medical witnesses should not be contained in the printed record, and this stipulation was made in view of the fact that this writ of error is being prosecuted to a verdict in favor of the defendant.

The foregoing disposes of plaintiff's assignments of error Nos. 1, 2, and 3, which read:

"1. The court erred in refusing to grant plaintiff's motion to set aside the verdict and grant a new trial.

"2. The court erred in entering judgment on the verdict which was contrary to the law and evidence.

"3. The court erred in refusing to give to the jury plaintiff's requested instruction No. 1, which would have directed a verdict for plaintiff."

As the judgment of the Circuit Court of Ohio County must be reversed, the verdict set aside, and a new trial awarded, the questions arising on plaintiff's fourth and fifth assignments of error, the fourth of which is to the effect that the trial court erred in permitting the ordinance of the City of Wheeling to be introduced in evidence over objection, and in permitting the same to remain in evidence throughout the presentation of defendant's case over motion to exclude, though the jury was eventually instructed to disregard the ordinance; and the fifth of which assignments of error is to the effect that the trial court erred in granting the jury's request, during the course of their deliberations, and the court reread the ordinance of the City of Wheeling, although the jury was instructed at the time the provisions of the ordinance were reread to the jury to disregard the same, are moot.

For the foregoing reasons the judgment of the Circuit Court of Ohio County is reversed, the verdict set aside, and a new trial awarded.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*